**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

> ELECTRONICALLY FILED
> Jul 09 2020
> U.S. DISTRICT COURT
> Northern District of WV

| | | |
|---|---|---|
| **JANE DOE.,** | ) | Civil Action No. **2:20-CV-19 (Kleeh)** |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **TIMOTHY PHILLIPS,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Jane Doe,[1] brings this claim to compensate her for the years of forced labor Defendant coerced her to perform at his business in Elkins, West Virginia, and the long-term, far-reaching harms that forced labor has caused. The Defendant lured Plaintiff to move from Morocco to the United States, promising to care for her after she relocated. However, once Plaintiff arrived in West Virginia, Defendant required that she begin working at his business.

Over the following three years, Plaintiff was required to work long hours for little pay. Defendant isolated, threatened, and stole from Plaintiff to force her to continue working for his business. When Plaintiff attempted to stop working for the Defendant, he punished her by starving her for days at a time. While Plaintiff has since escaped Defendant's control, the effects of this forced labor remain. Plaintiff has been denied years of compensation for work she performed, and has suffered significant trauma and emotional distress. Plaintiff brings this claim under the

---

[1] As discussed in Plaintiff's Motion to Proceed Pseudonymously, Plaintiff respectfully requests this Court permit her to proceed pseudonymously in this action, given the sensitive nature of the harms she has suffered including violations of the Trafficking Victims Protection Act, and the significant domestic violence described herein.

1

Trafficking Victims Protection Act, the Fair Labor Standards Act, and the West Virginia Wage Payment and Collection Act to compensate her for these harms.

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.      This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendant resides in this district and a substantial part of the events giving rise to this claim occurred in this district.

## Parties

4.      Plaintiff is a thirty-six-year-old citizen of Morocco. She currently resides in the United States.

5.      Defendant Timothy Phillips is a resident of Randolph County, West Virginia. Defendant is the sole proprietor of Busy Bee Detail Shop, which has a principal office address of RR 1 Box 187, Elkins West Virginia 26241.

## Statement of Facts

6.      Plaintiff is a citizen of Morocco who, until 2015, resided in Casablanca, Morocco.

7.      In or around 2014, Plaintiff and Defendant were put in contact with one another by one of Defendant's employees. Defendant had expressed to this employee that he would like to have a wife from Morocco.

8.      Plaintiff and Defendant communicated over the telephone for approximately six months. Six months after being introduced, Defendant travelled to Morocco, where he proposed to Plaintiff.

9.      Defendant induced Plaintiff to move to West Virginia, promising that he would care for her once she moved to the United States. During the period that Defendant was convincing Plaintiff to leave Morocco, Defendant did not inform her that she would be required to work for him once she arrived in West Virginia.

10.     In or around April 2015, Plaintiff moved to West Virginia to live with Defendant.

11.     Plaintiff and the Defendant were married shortly thereafter, in May of 2015.

12.     Shortly after Plaintiff and Defendant were married, he informed her that she was required to work for him "to pay her expenses." Plaintiff was shocked by this demand, as she was never told that she would need to work for Defendant once she arrived in the United States.

13.     Plaintiff was thereafter forced to work for Defendant for over three years, from March 2015 until late August 2018.

14.     To ensure that Plaintiff continued to work for him, Defendant engaged in repeated and regular physical and emotional abuse, economic exploitation, and threatened abuse of the legal process, as described herein.

**Plaintiff's Working Conditions at Busy Bee Detail Shop**

15.     The Busy Bee Detail Shop [hereinafter "BBD"], owned and operated by Defendant is located at 721 Elliott Ridge Road, Elkins, West Virginia 26241. Defendant is the sole proprietor of BBD.

16.     BBD is a detail shop where car interiors and exteriors are cleaned. The shop services the cars of individual customers, as well as cars that other companies contract BBD to clean.

17.     During the non-summer months, BBD was customarily open from 8 am to 7 pm on weekdays. Though BBD was generally closed on weekends, the shop occasionally opened during those hours to serve customers.

18.     During the summer, BBD was significantly busier. To accommodate the increased demand for services, the shop operated the same weekday hours and additionally remained open from 8 am to 7 pm on weekends.

19.     Defendant employed three year-round workers, one of whom was Plaintiff. During the summer months when there was increased business, Defendant hired additional temporary workers.

20.     Defendant first forced Plaintiff to begin working at BBD in or around May 2015, shortly after her marriage to Defendant.

21.     Defendant required Plaintiff to work during all the hours that BBD was open. Plaintiff regularly worked eleven hours a day, five days a week, in the non-summer months and eleven hours a day, seven days a week, during the summer.

22.     Plaintiff's primary duty at BBD was cleaning car interiors. She spent hours each day vacuuming car interiors, cleaning windows, and washing and polishing car exteriors.

23.     When Plaintiff was not cleaning cars, she would be required to assist Defendant or employees of Defendant with other work at BBD.

24.     Defendant supervised Plaintiff' work at BBD. He routinely assigned her the most physically demanding and time consuming cars to clean. When Plaintiff protested these assignments he would yell at and threaten her.

25.     As a result of the physical demands of the work Plaintiff was required to perform at BBD she now suffers from carpal tunnel syndrome, which will require surgical treatment.

26.     Plaintiff was never permitted to have keys to the shop, and was not able to determine her own work hours. She was not permitted to solicit her own clients or decide which cars she would clean. She was required to use specific cleaning products supplied by Defendant, and was required to clean the cars according to his direction.

27.     Despite this, Defendant told Plaintiff that she was self-employed, and required that she identify herself as an independent contractor.

**Defendant's Systematic Wage Theft and Economic Exploitation**

28.     Plaintiff was forced to work at BBD for approximately one hundred and seventy four (174) weeks. As described above, Plaintiff' work weeks averaged between fifty-five (55) and seventy-seven (77) hours per week.

29.     When Plaintiff first arrived in the United States in May 2015, she had not yet received authorization to work in this country. Notwithstanding Defendant's knowledge of Ms. Plaintiff's inability to work legally, Defendant forced Plaintiff to begin working at BBD.

30.     During the period before Plaintiff received her work authorization, Defendant intentionally obfuscated the meager wages that he paid her for her labor. Defendant primarily paid Plaintiff in cash, and occasionally would have others write out checks to Plaintiff in their name.

31.     During this period, Defendant would pay Plaintiff far below minimum wage, and many weeks she was not paid at all despite the long hours she was forced to work.

32.     On information and belief, Defendant did not keep records of these transactions.

33.     The payments made to Plaintiff were far below the statutory minimum wage.

34.     Thereafter when Plaintiff received her work authorization, Defendant told her that she would be paid in the same manner as the other BBD employees.

35.    Defendant paid BBD employees based on the number of cars that had been cleaned in a pay period. Fifty (50) percent of the total profits were taken by Defendant. The other fifty (50) percent were to be divided equally among the workers as wages.

36.    BBD employees, apart from Plaintiff, were paid each Friday. Defendant would present the other employees with their paychecks, but when Plaintiff asked for hers, she would be told that there was not enough money to pay her that week and that she would need to wait to receive her pay.

37.    As had been the case when she first began working, Plaintiff was paid drastically substandard wages at an irregular rate. Plaintiff would go weeks, sometimes up to two months, without any pay at all.

38.    When Plaintiff did receive paychecks, they did not reflect the number of hours that she had worked and were substantially less than what she was owed, given Defendant's payment practices, and substantially less than minimum wage.

39.    In late 2017, Plaintiff requested that Defendant pay her every week, as he did the other employees. In order to receive these weekly paychecks, Plaintiff was required to promise that she would not try to deposit the checks until Defendant told her it was permissible to do so.

40.    From that point on, Plaintiff received a paycheck each week. Though the amount of those checks varied widely despite Plaintiff regular workweek, every check was substantially lower than minimum wage.

41.    Plaintiff is not able to drive, and therefore her only access to vehicular travel was through Defendant. Through this mechanism of control, Defendant restricted Plaintiff's movement.

42.     Defendant would not permit Plaintiff to open a bank account in her own name or to cash her paychecks. Instead, Defendant insisted that Plaintiff sign each check and permit him to cash them at the bank on her behalf.

43.     However, when Defendant cashed Plaintiff' checks, he often returned with substantially less cash than the value of the checks. When Plaintiff questioned this, Defendant told her that was all she was getting.

44.     As a result, Plaintiff received only a portion of the already meager wages that she was being paid for her substantial labor.

45.     On information and belief, Defendant did not keep records of the cash wages actually paid to Plaintiff.

46.     Further diminishing her wages, Defendant required Plaintiff to pay him out of the little pay she did receive. At the end of each month, Defendant calculated the bills for the home and the business and demanded that Plaintiff pay fifty (50) percent.

47.     When Plaintiff's low wages were not enough to pay her purported debts to Defendant, he would become enraged – yelling, cursing, and threatening her.

48.     As described in detail elsewhere in this complaint, Defendant would require Plaintiff to pay him to leave the house, eliminating any possibility of her earning additional income.

49.     Through this structure of economic exploitation, Defendant effectively trapped Plaintiff. She had no bank account, no money, and was restricted to the home except when accompanied by Defendant.

50.     Defendant leveraged the power of Plaintiff's economic dependence frequently. For example, Plaintiff briefly returned to Morocco to visit family. Defendant, furious that she was

leaving, held the largest check belonging to Plaintiff and refused to return it to her until she returned from her trip. When Plaintiff returned, he tore the check up in front of her as punishment for her leaving.

**Coercion, Emotional and Physical Abuse**

52.     When Plaintiff married Defendant and moved to West Virginia, Defendant informed her that she was required to work for him to pay off her expenses. In order to exert pressure on Plaintiff to force her to continue working, Defendant engaged in regular, repeated acts of coercion and abuse.

53.     Defendant restricted Plaintiff' access to transportation, allowing him to control when she was permitted to leave the house and where she was permitted to travel.

54.     When Defendant did permit Plaintiff to leave the home, he required that she pay him. He justified this practice by claiming that these payments went towards the cost of gas. However, Plaintiff was made to pay amounts far in excess of what gas to and from her destinations would cost.

55.     If, after she paid her alleged debts to Defendant, Plaintiff wages were not enough for her to pay for travel, Defendant refused to drive her, even to medical appointments.

56.     The few times Plaintiff attempted to leave the house by walking, Defendant followed her in the car and required that she return to the house through intimidation.

57.     Defendant did not permit Plaintiff to interact with the community, and isolated her to the home.

58.     This isolation was further exacerbated by the fact that Plaintiff is not a native English speaker, and often relied on Defendant to communicate in English.

59.     Further, Defendant often admonished Plaintiff when she communicated with friends and family in Morocco.

60.     Defendant would often use Plaintiff isolation to coerce her into continuing to live with and work for him.

61.     Defendant often told Plaintiff she was lucky that she had a house to stay in, and that she should be thankful to him for providing that to her. Defendant made clear to Plaintiff that she was not permitted to live in the house unless she continued to work for him.

62.     On numerous occasions Defendant threatened to kick Plaintiff out of the house. Plaintiff - without money, a connection to the community, a car, ability to communicate in English, or an alternative livelihood – did not believe that she had options other than continuing to work for the Defendant.

63.     Additionally, Plaintiff as a recent immigrant to the United States and to West Virginia was unaware of her rights as a worker or any resources that may be available to individuals in her position.

64.     When Plaintiff was not able to pay her alleged debts to Defendant, he became enraged. During these periods Defendant yelled at Plaintiff, cursing at her and calling her a whore.

65.     These regular and repeated acts of coercion and emotional abuse were punctuated by Defendant's physical abuse of Plaintiff.

66.     Following Ms. Plaintiff's escape from Defendant, she sought a Protective Order from the Family Court of Monongalia County, West Virginia. In awarding that Protective Order, the Court found that "[i]t is more likely than not that there is a long history of abuse wherein Respondent has physically abused Petitioner, has pointed a gun at her, and has taken advantage of her immigration status to impose his will upon her."

67.     On one occasion, Plaintiff attempted to call the police to report the abuse she was suffering at the hands of the Defendant. In response, Defendant grabbed her and forced her to tell the police that there was nothing to be concerned about and that they need not come to the house.

68.     Early on in her employment by Defendant, after she realized that she had been deceived, Plaintiff refused to work at BBD for Defendant.

69.     In the period during which Plaintiff was being forced to work prior to having the appropriate work authorization an associate of Defendant threatened to report her to immigration authorities.

70.     Scared of the consequences she may face if she were to be reported, Plaintiff informed Defendant that she would not work for him at BBD until she had the appropriate work authorization.

71.     This refusal enraged Defendant, who yelled and screamed in Plaintiff' face. After Plaintiff continued to refuse to work, he ultimately told her "If you don't work, you don't eat."

72.     Defendant spent the following week denying Plaintiff any food, starving her as punishment for her refusal to work. Defendant would not allow Plaintiff to leave the house to get food, and would not bring food to the house for her.

73.     Plaintiff was only able to make it through this period by eating small amounts of food she had hidden from the Defendant.

74.     At the end of the week, Defendant provided Plaintiff with one hundred (100) dollars, and told her that she should buy herself food with it, but that she would be required to work from that point forward.

75.     From this experience, Plaintiff understood that Defendant was willing to physically harm her as punishment for refusing to work. This, paired with the other physical and emotional

abuse which Plaintiff faced at the hands of the Defendant, coerced her into continuing to have her labor exploited.

## Abuse of Legal Process

76.    When Plaintiff complained about the conditions of her work, her lack of pay, or her mistreatment, Defendant regularly threatened to report her to immigration authorities.

77.    Plaintiff was scared of what punishment she might suffer for being forced to work prior to receiving work authorization.

78.    Plaintiff was particularly concerned that she may be sent back to Morocco. Given the great reputational harm she would suffer as a result of her marriage and mistreatment here in the United States, Plaintiff did not believe that it would be possible for her to return to live in Morocco without facing irreversible and serious consequences.

79.    Defendant's threats, paired with these fears, led Plaintiff to believe she had no option other than to continue working for Defendant despite the physical, emotional, and economic abuse she was suffering.

80.    Defendant led Plaintiff to believe that she needed to continue working for him at BBD and that he was able to, and would, use the legal system to seek retribution against her if she stopped working.

## Plaintiff' Escape from Defendant

81.    Throughout the period described herein, Defendant would regularly make Plaintiff stand outside as a punishment.

82.    In late August, 2018, Defendant again forced Plaintiff to stand outside the house as punishment for arguing with him.

83.     Plaintiff was left outside, without any information about where she could turn for resources and support.

84.      Seeing her crying outside, a bystander called the police who came to speak to Plaintiff and Defendant about what was happening.

85.     After speaking with her, the police assisted Plaintiff in leaving Defendant's control.

86.     After Plaintiff had escaped Defendant's control, when Defendant learned that Plaintiff was leaving, he attempted to coerce her into returning by claiming that she needed to provide him with all of the paychecks she had received that had not yet been cashed, promising to write her one large check for the total value. Plaintiff refused, and asked for her final paycheck.

87.      Defendant refused to provide Plaintiff with her final paycheck, and instead wrote out on a slip of paper that he owed her money. Plaintiff again demanded she receive her final paycheck.

88.     Defendant told Plaintiff that he did not have the money to pay her, and that he would only provide her with her final paycheck if she waited to cash it. Plaintiff agreed, and Defendant provided her with a paycheck.

89.     Plaintiff, as instructed by Defendant, waited two months to attempt to cash her paychecks. At that time she was informed that there had been a stop payment placed on each of her checks.

90.     Following her escape from Defendant the Family Court of Monogalia County found that he "tried to track her down necessitating her relocation to a Morgantown shelter." That finding was one which supported the imposition of a protective order forbidding Defendant from possessing firearms while that order was in place.

**Damages**

Plaintiff came to West Virginia having been promised a loving marriage. Instead, she spent three years forced to work long hours with little pay, suffering emotional, physical, and economic abuse if she didn't comply with Defendant's demands. In addition to the years of unpaid wages she is owed for her forced labor, she also has suffered substantial emotional distress, and has a number of related medical costs.

Litigation cannot make Plaintiff whole, given the years of abuse which she suffered, but she humbly requests this Court grant her requested relief so as to permit her to begin to repair the harm caused by Defendant and to begin to live, and work, with dignity.

## CLAIMS FOR RELIEF

### Count One
### Forced Labor in Violation of 18 U.S.C. § 1589

91.     Plaintiff incorporates by reference the preceding paragraphs.

92.     Defendant knowingly obtained Plaintiff's labor through force, threats of force, physical restraint, or threats of physical restraint in violation of 18 U.S.C. § 1589(a)(1).

93.     Defendant knowingly obtained Plaintiff's labor by means of serious harm and threats of serious harm in violation of 18 U.S.C. § 1589(a)(2).

94.     Defendant knowingly obtained Plaintiff's labor by means of abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3).

95.     Defendant knowingly obtained Plaintiff's labor through a scheme and pattern intended to cause Plaintiff to believe that failure to provide her labor would result in serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

96.     Plaintiff is permitted to bring a civil action against Defendant pursuant to 18 U.S.C. § 1595.

97.     As a direct and proximate result of Defendant's violations, Plaintiff has suffered economic losses and severe emotional distress.

98.     Plaintiff claims damages in an amount to be proven at trial, including attorney's fees and any other relief which this Court deems proper.

## Count Two
### Trafficking with Respect to Forced Labor in Violation of 18 U.S.C. § 1590

99.     Plaintiff incorporates by reference the preceding paragraphs.

100.     Defendant knowingly recruited, harbored, transported, and obtained Plaintiff for labor or services in violation of 18 U.S.C. § 1589 when he deceived Plaintiff into moving to the United States.

101.     Plaintiff is permitted to bring a civil action against Defendant pursuant to 18 U.S.C. § 1595.

102.     As a direct and proximate result of Defendant's violations, Plaintiff has suffered economic losses and severe emotional distress.

103.     Plaintiff claims damages in an amount to be proven at trial, including attorney's fees and any other relief which this Court deems proper.

## Count Three
### Mandatory Restitution in Accordance with 18 U.S.C. § 1593

104.     Plaintiff incorporates by reference the preceding paragraphs.

105.     As described herein, Defendant violated 18 U.S.C. § 1589 and 18 U.S.C. § 1590.

106.     Plaintiff is therefore entitled to mandatory restitution in accordance with 18 U.S.C. § 1593(3).

## Count Four
### Failure to Pay Minimum Wage, 29 U.S.C. § 201 *et seq*.

107.     Plaintiff incorporates by reference the preceding paragraphs.

108.    The Fair Labor Standards Act mandates that employees be paid a minimum wage. 29 U.S.C. § 205(a).

109.    Defendant failed to pay Plaintiff the required minimum wage for her hours worked.

110.    As a direct and proximate result of Defendant's unlawful failure to pay Plaintiff the wages which she was due, Plaintiff lost wages in an amount to be proven at trial.

111.    As a direct and proximate result of Defendant's unlawful failure to pay Plaintiff the wages which she was due, Plaintiff has incurred other costs and expenses, including attorney's fees, which she is entitled to recover from Defendant.

112.    Defendant did not have a good faith basis on which to justify the continued failure to comply with federal law, thereby justifying an award of liquidated damages.

<u>Count Five</u>
**Failure to Pay Required Overtime Wages, 29 U.S.C. § 207 *et seq*.**

113.    The preceding paragraphs are incorporated by reference.

114.    The Fair Labor Standards Act establishes "…no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §207(a)(1).

115.    Employees of Defendant were engaged in commerce or the production of goods for commerce or were employed in an enterprise engaged in commerce or in the production of goods for commerce.

116.    Defendant failed to pay Plaintiff at a rate of at least one and one-half times her regular rate for hours worked in excess of forty a week in violation of 29 U.S.C. §207(a)(1).

117.    As a direct and proximate result of Defendant's unlawful failure to pay Plaintiff the wages which she was due, Plaintiff lost wages in an amount to be proven at trial.

118.    As a direct and proximate result of Defendant's unlawful failure to pay Plaintiff the wages which she was due, Plaintiff has incurred other costs and expenses, including attorney's fees, which she is entitled to recover from Defendant.

119.    Defendant did not have a good faith basis on which to justify the continued failure to comply with federal law, thereby justifying an award of liquidated damages.

### Count Six
### Failure to Maintain Accurate Records, 29 U.S.C. § 211(c)

120.    The preceding paragraphs are incorporated by reference.

121.    The Fair Labor Standards Act Mandates that "[e]very employer subject to any provision of this chapter… shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…" 29. U.S.C. §211(c).

122.    Defendant failed to maintain adequate and accurate records concerning employee wages, hours, and conditions and practices of employment as required by the Fair Labor Standards Act.

123.    This failure to maintain adequate records contributed to Defendant's systemic wage theft, as it obscured the meager wages that Plaintiff was receiving.

### Count Seven
### Unlawful Wage Assignment in Violation of W. Va. Code § 21-5-3(e)

124.    Plaintiff is an employee under W. Va. Code § 21-5-1(3).

125.    Defendant is an employer under W. Va. Code § 21-5-1(m).

16

126.    Defendant, in requiring that Defendant pay monthly "debts" for the operation of BBD out of the wages which she received, unlawfully assigned Plaintiff's future wages in violation of W. Va. Code § 21-5-1(e).

127.    Defendant's unlawful wage assignment continued for longer than one year, was not in writing, was not notarized, and did not specify the amounts which Plaintiff was expected to pay.

128.    As a direct and proximate result of Defendant's unlawful wage assignment, Plaintiff lost wages in an amount to be proven at trial.

129.    As a direct and proximate result of Defendant's unlawful wage assignment, Plaintiff has incurred other costs and expenses, including attorney's fees, which she is entitled to recover from Defendant.

## Count Eight
## Unlawful Wage Payment Practices in Violation of W. Va. Code § 21-5-3

130.    Plaintiff is an employee under W. Va. Code § 21-5-1(3).

131.    Defendant is an employer under W. Va. Code § 21-5-1(m).

132.    Defendant regularly, repeatedly, and customarily failed to pay Plaintiff twice each month.

133.    Defendant regularly, repeatedly, and customarily allowed more than nineteen days to pass between payments made to Plaintiff.

134.    These unlawful payment practices contributed to Defendant's systematic wage theft of Plaintiff's already substandard wages, in violation of W. Va. Code § 21-5-3(a).

135.    As a direct and proximate result of Defendant's unlawful wage payment practices, Plaintiff lost wages in an amount to be proven at trial.

136.     As a direct and proximate result of Defendant's unlawful wage payment practices, Plaintiff has incurred other costs and expenses, including attorney's fees, which she is entitled to recover from Defendant.

### Count Nine
### Fraud

137.     The preceding paragraphs are incorporated by reference.

138.     Defendant misrepresented to Plaintiff that she would be able to move to the United States in furtherance of their marital relationship and suppressed that she would be forced to work for him without adequate compensation.

139.     In fact, Defendant forced Plaintiff to work as his employee for nearly three years.

140.     During the course of that employment, Defendant fraudulently represented to Plaintiff that she would be paid based on the number of cars that she washed.

141.     In fact, Defendant's payments to Plaintiff were erratic and for far less wages than what she was told by Defendant she was owed.

142.     The Defendant's misrepresentations and suppressions of fact were material.

143.     The Defendant's misrepresentations and suppressions of fact were reckless, knowing, and/or intentional.

144.     The Plaintiff reasonably relied upon the Defendant's misrepresentations and suppressions of fact when immigrating to the United States.

145.     The Plaintiff was proximately harmed by the Defendant's misrepresentations and suppressions of material facts.

### Count Ten
### Intentional Infliction of Emotional Distress

146.     Plaintiff incorporates by reference the preceding paragraphs.

147.    The Defendant, in using the coercive and abusive tactics described herein to force Plaintiff to provide her labor for little, and often no, pay is outrageous conduct under West Virginia Law and constitutes and intentional infliction of emotional distress, for which punitive damages are authorized.

148.    As a direct and proximate result of Defendant's violations, Plaintiff has suffered severe emotional distress, and has incurred physical, mental, economic, and emotional damages.

149    Plaintiff claims damages in an amount to be proven at trial, including attorney's fees and any other relief which this Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

I.    Actual damages suffered by the Plaintiff including, but not limited to, stolen and withheld wages and amounts for past and future costs for medical and psychological care;

II.    Liquidated damages as permitted by law;

III.    Mandatory restitution as required by 18 U.S.C. § 1593;

IV.    Emotional distress damages;

V.    Punitive damages as this Court finds just;

VI.    Costs incurred by the Plaintiff including, but not limited to, attorney's fees and costs incurred as permitted by law; and

VII.    All other relief which this Court deems equitable, just, and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ISSUES SO TRIABLE.**

> **Respectfully submitted,**
> **JANE DOE**
> **By counsel,**

_____/s/Aubrey Sparks_____

Aubrey Sparks (WV Bar No. 13469)
Mountain State Justice, Inc.
1217 Quarrier Street
Charleston, West Virginia 25301
(p) 304-344-3144
(f) 304-344-3145
aubrey@msjlaw.org